UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Pandora Distribution, LLC,                                  Case No. 3:12-cv-2858

            Plaintiff,

   v.                                                                  MEMORANDUM OPINION
                                                            AND ORDER

Ottawa OH, LLC, et al.,

            Defendants.

## I. INTRODUCTION

It perhaps is not an exaggeration to say the parties to this litigation agree on only two things: (1) there are two conveyer bridges connecting two warehouses, divided by a railroad track, in Ottawa, Ohio; and (2) no one wants the bridges to be there anymore. There is substantial disagreement on nearly everything else, including the primary questions presented by the parties' motions for summary judgment which are currently before me – who owns the bridges, who is responsible for removing them, and who, if anyone, is responsible for compensating another party for any damage which results from the presence, removal, or both, of the bridges?

Pandora Distribution, LLC; Ottawa OH, LLC ("Ottawa"); Philips Electronics North America Corporation ("Philips"); Genessee & Wyoming, Inc.; and, First American Title Insurance Company each have filed motions for summary judgment on a variety of claims, counter-claims, and cross-claims. (Doc. No. 250, 251, 252, 256, 257, and 258).

## II.    BACKGROUND

In 1970, Philips[1] entered into an agreement with the Detroit, Toledo and Ironton Railroad (the "Detroit Railroad"). Under this agreement, the Detroit Railroad granted Philips an easement to construct, use, and maintain a conveyer bridge between two warehouses in Ottawa, Ohio, which Philips owned (along with other buildings and additional, adjoining real property) and which were separated by the Detroit Railroad's railroad tracks (the "Easement Agreement"). (Doc. No. 251-2 at 47-51). The conveyer bridge was designed to transfer pallets of material between the two warehouses. The Easement Agreement approved specific plans for the construction of the conveyer bridge and required Philips to make changes to the conveyer bridge if necessitated by changes made to the railroad tracks. (Doc. No. 251-2 at 47-51).

In 1986, Philips and the Grand Trunk Western Railroad Company, which had replaced the Detroit Railroad as the entity in control of the railroad tracks, entered into a license agreement for the construction of a second conveyer bridge between Philips' warehouses (the "License Agreement"). (Doc. No. 251-2 at 43-46). The License Agreement has an initial term of one year, and automatically renews for additional one-year terms, unless the agreement is terminated upon 60 days' written notice. (Doc. No. 251-2 at 43). That agreement also provides that, upon the termination of the License Agreement, the Licensee is "to remove all Licensee's material from the premises of the [railroad] and to leave the same in a neat, clean and level condition." (Id.).

This state of affairs continued without substantial change until October 11, 2005, when Philips sold all of the real property it owned at 700 N. Pratt Street in Ottawa, Ohio, along with all personal property located on the premises, to DBI Partners, LLC. DBI then split off a portion of

---

[1] The properties involved in this litigation were owned by a variety of Philips-related entities – eight, by my count. (*See* Doc. No. 256 at 13 n.4). The precise route and times of ownership does not appear to be a subject of dispute in this litigation and, for the sake of simplicity, I will refer generally to these organizations as "Philips."

this property, which it sold to Pandora on January 24, 2006. This portion, which DBI transferred to Pandora through a limited warranty deed, is located to the east of the railroad tracks over which the conveyer bridges pass (the "Pandora Property").

DBI and Pandora also executed a document titled "Encroachment Agreement." (Doc. No. 251-7). The Encroachment Agreement was recorded in the Putnam County, Ohio Recorder's Office on the same day as the deed to the Pandora Property, and states that DBI and Pandora "agree that the two (2) existing conveyers shown on the Topographic Survey [dated January 16, 2006 and prepared in connection with the purchase and sale of the Pandora Property] shall remain the sole property of DBI . . . ." (Doc. No. 251-7 at 1). The Encroachment Agreement also requires DBI to assume the cost of repairing and maintaining the conveyer bridges, and to obtain Pandora's prior written consent before removing them. (Id.). Further, the Encroachment Agreement permitted Pandora to demand DBI remove the conveyer bridges and repair any resulting damage to the Pandora Property. (Id.).

Subsequently, DBI sold another portion of property to Ottawa. (Doc. No. 252-10). This portion, which DBI also transferred through a limited warranty deed, is located to the west of the railroad tracks over which the conveyer bridges pass (the "Ottawa Property").

Michael Borer, then an attorney and title agent based in Putnam County, Ohio, assisted with first the Philips sale to DBI and the later DBI sales to Pandora and Ottawa. For each transaction, Borer issued title insurance commitments and title insurance policies underwritten by First American.

Shortly after Ottawa and DBI completed the purchase and sale of the Ottawa Property, Pandora requested that Ottawa repair the conveyer bridges, asserting Ottawa had assumed DBI's responsibility to do so under the Encroachment Agreement. Ottawa refused, contending it had not purchased the conveyer bridges and that it did not have any obligations under the Encroachment

Agreement because Ottawa was not a party to that agreement.  Pandora, Ottawa, DBI, and Borer attempted to resolve the dispute over the conveyer bridges throughout 2007, but those discussions ultimately were unsuccessful.  By early 2008, DBI ceased participating in the discussions, and further attempts by Pandora and Ottawa to informally resolve the dispute also failed.

Pandora subsequently filed suit in November 2012, initiating a stream of pleadings.  Pandora initially named Ottawa and DBI as defendants.  (Doc. No. 1).  Ottawa answered the complaint and filed a counterclaim against Pandora, (Doc. No. 13), but DBI failed to respond to the complaint and Pandora obtained a default judgment against DBI.  (Doc. No. 62).  Pandora later amended its complaint to add claims against Philips and Genesee & Wyoming.  (Doc. No. 25).  Ottawa amended its counterclaim against Pandora, added a crossclaim against DBI, and filed a third-party complaint against First American, Philips, and Genesee & Wyoming.  (Doc. No. 26).  Ottawa later amended its third-party complaint and its crossclaim.  (Doc. No. 48).

Philips asserted a crossclaim against Ottawa, DBI, and Genesee & Wyoming, and a counterclaim against Pandora, (Doc. No. 56), but subsequently dismissed those claims without prejudice.  (Doc. No. 64).  Pandora then filed a second amended complaint, (Doc. No. 65), Ottawa amended its third-party complaint against First American, (Doc. No. 67), and First American asserted a counterclaim against Ottawa.  (Doc. No. 72).

Pandora later filed a third amended complaint, dropping its claims against Genesee & Wyoming, after the railroad assigned its claims to Pandora.  (Doc. No. 131).  Pandora then filed a fourth amended complaint, (Doc. No. 205), and Ottawa further amended its third-party complaint against First American.  (Doc. No. 212).

### III.  STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

4

All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV. ANALYSIS

Each remaining party in this litigation has filed for summary judgment. First American seeks summary judgment on the claims asserted in Ottawa's third-party complaint as well as on First American's counterclaim against Ottawa. (Doc. No. 250). Pandora seeks summary judgment on all claims in dispute between itself and Ottawa. (Doc. No. 251). Genesee & Wyoming also seeks summary judgment on Ottawa's claims against it. (Doc. No. 252). Philips requests summary judgment on all claims asserted against it by Pandora and Ottawa. (Doc. No. 256). Ottawa seeks summary judgment on Pandora's claims against it, (Doc. No. 257), and on its claims against First American. (Doc. No. 258).

#### A. THE BRIDGES

The issue of who owns the conveyer bridges is the starting point for analyzing any of the parties' claims, and the answer to the ownership question begins with determining the proper characterization of the conveyer bridges.

While American law has long adhered to the "simple and natural classification of property into the obvious and universal distinction of things moveable and things immovable, things tangible and things intangible," *Teaff v. Hewitt*, 1 Ohio St. 511, 526 (1853), there remain some items which do not fit neatly into one category or the other and which in fact may move between the categories.

5

Property that once was moveable may be attached to immoveable property in such a way that the law treats the formerly-moveable property as immoveable. More specifically, items of personal property, like metal and rubber, may be converted into fixtures and then treated as real property.

Personal property may be converted into a fixture if the following criteria are met: "(1) [a]ctual annexation to the realty or something appurtenant thereto; (2) appropriation to the use or purpose of the realty with which it is connected; and (3) the intention of the party making the annexation to make the article a permanent accession to the freehold." *Zangerle v. Standard Oil Co. of Ohio*, 60 N.E.2d 52, 56 (Ohio 1945).

The first criterion, considered "the least important," requires a "very slight" physical connection of the personal property and the real property. *Holland Furnace Co. v. Trumbull Savings & Loan Co.*, 19 N.E.2d 273, 275 (Ohio 1939). The conveyer bridges were secured to the warehouses on the Pandora Property and the Ottawa Property and could not be easily removed. Therefore, I conclude the conveyer bridges satisfy the first factor of the fixture formulation. *See, e.g., Masheter v. Boehm*, 295 N.E.2d 917, 920 (Ohio Ct. App. 1973) ("*Masheter I*") (noting "[t]he chattel may be bolted or screwed in place . . . .") (*rev'd on other grounds*).

The second criterion has received a relatively-lower amount of attention from courts applying these factors, but generally seeks to distinguish "between chattels primarily devoted to the business conducted on the premises and chattels devoted primarily to the realty itself." *Masheter v. Boehm*, 307 N.E.2d 533, 538 (Ohio 1974) ("*Masheter II*"). The conveyer bridges were not used merely for the idiosyncratic purposes of Philip's business. *Cf. Wheeling-Pittsburgh Steel Corp. v. Bd. of Revision*, 271 N.E.2d 861 (Ohio 1971) (holding the caging system of an egg production facility was personal property, not a fixture); *Roseville Pottery, Inc. v. Cnty. Bd. of Revision*, 77 N.E.2d 608 (Ohio 1948) (pottery kilns attached to concrete slabs were not fixtures). Instead, they were installed for the general purpose of connecting two buildings and offered benefits to subsequent owners of the real

6

property. *See, e.g., Zangerle v. Standard Oil*, 60 N.E.2d at 54 (citing "driveways" and "bridges" as an example of property permanently attached to real property which could benefit later owners even if those owners were involved in a different business); *Masheter II*, 307 N.E.2d at 538 ("[A]rticles annexed to the premises so as to become a part of it, even though of benefit to any and all businesses which might be carried on there, take on the legal characteristics of real property.")

The final criterion requires a court to determine whether the article was intended to be permanently annexed to the real property. "[I]t is not necessarily the real intention of the owner of the chattel which governs. His apparent or legal intention to make it a fixture is sufficient." *Holland Furnace Co.*, 19 N.E.2d at 275. This intention

> may be inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, the purpose and use for which the annexation is made, the utility in use or the indispensability of the combination when the chattel is once attached to the realty in the use of the whole, and the relationship of the owner of the chattel to the owner of the realty and to others who may become interested in or owners of the property.

*Id.* at 275–76.

The *Holland Furnace Co.* discussion conclusively points the facts of this case to the determination that the conveyer bridges are fixtures. Philips owned both of the warehouses when it constructed the conveyer bridges between those warehouses. It created openings in the walls of both warehouses in order to attach the conveyer bridges, and also created a means of utilizing the conveyer bridges from within both buildings.

While Pandora argues Philips could not have intended for the conveyer bridges to be permanent because the Easement Agreement and the License Agreement included provisions covering the removal of the conveyer bridges, (Doc. No. 290 at 11), the case law is clear that the term "permanence" does not mean "unending." A fixture "is not less a fixture because, having a limited life, it may have to be eventually replaced, or substantially overhauled." *Masheter I*, 295 N.E.2d at 920. The Easement and License Agreements provided no more than a structure for the

7

possible removal of the conveyer bridges and offer no indication as to whether Philips or the railroad intended the conveyer bridges to be real property or personal property. The "[i]ntention to render a chattel a fixture is . . . the determination to devote the chattel to the use and service of the land or structure already a part of the land, in such manner as to enhance the serviceability of the whole as a permanent unit of property to whatsoever use it may be devoted." *Zangerle v. Standard Oil Co.*, 60 N.E.2d at 58.

A reasonable person viewing the warehouses together would conclude the conveyer bridges were part of the buildings – that is, that they were part of the real property – and were not merely a temporary addition to the business which the owner intended to remove. *Id.* ("Intention to permanently attach must be inferred from all the surrounding circumstances which can be objectively observed.").

### B. PANDORA AND OTTAWA

The proper characterization of the bridges quickly resolves the question of ownership.

#### 1. The Deeds

Fixtures are real property, *Teaff*, 1 Ohio St. at 527, and they are transferred between parties in the same manner as real property – by deed. Under Ohio law, "[i]n a conveyance of real estate . . . , all rights, easements, privileges, and appurtenances belonging to the granted estate <u>shall be included in the conveyance</u>, unless the contrary is stated in the deed, and it is unnecessary to enumerate or mention them either generally or specifically." Ohio Rev. Code § 5302.04 (emphasis added).

The conveyer bridges first passed from Philips to DBI. Philips transferred all of its "right, title, and interest" in the warehouses and the adjacent property to DBI by limited warranty deed. (Doc. No. 251-2 at 31-39). This deed did not contain an exception for the conveyer bridges.

The conveyer bridges next passed from DBI to Pandora. DBI granted its interest in the Pandora Property to Pandora by limited warranty deed. (Doc. No. 251-6). This deed also did not contain an exception for the conveyer bridges.

Pandora consistently contends it "did not intend to purchase the conveyers . . . ." (Doc. No. 251 at 7). While this may be true, it is not sufficient to overcome the effect of what Pandora in fact did. The words of the deed Pandora accepted are clear, and clearly conveyed to Pandora all real property described in Exhibit A to the deed. *See, e.g., Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978) ("[C]ommon words appearing in a written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument."); *Esteph v. Grumm*, 887 N.E.2d 1248, 1252 (Ohio Ct. App. 2008) ("When a deed is worded in clear and precise terms and its meaning is evident upon its face, there is no need to go beyond the four corners of the document." (citing *Hinman v. Barnes*, 66 N.E.2d 911, 916 (Ohio 1946))).

When the terms of a written document "are clear and unambiguous, [a] court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander*, 374 N.E.2d at 150. If, as Pandora contends, it did not intend to buy the conveyer bridges, it had an opportunity to insist that DBI amend the language of the deed to conform to what Pandora describes as the parties' agreement. Once it accepted the deed, however, Pandora became bound by the terms of the deed. *See, e.g., 37 Robinwood Assocs. v. Health Indus., Inc.*, 547 N.E.2d 1019, 1021 (Ohio Ct. App. 1988).

   2. **The Encroachment Agreement**

While it appears Pandora recognized there were problems with the deed from DBI, Pandora's attempt to resolve those problems – the Encroachment Agreement – was not effective in its apparent intended goal of relieving Pandora of the burden of ownership of the conveyer bridges.

9

The Encroachment Agreement states that DBI and Pandora agreed the conveyer bridges "shall remain the sole property of DBI." (Doc. No. 251-7 at 1). DBI, however, no longer owned the conveyer bridges; it transferred them by deed to Pandora.

Further, the Encroachment Agreement does not contain language which demonstrates the intent to convey real property from a grantor to a grantee. *Lighthorse v. Clinefelter*, 521 N.E.2d 1146, 1148 (Ohio Ct. App. 1987) ("It is generally held that a conveyance must contain operative words which indicate the intention to effect a grant." (citing 26 Corpus Juris Secundum (1956) 637, 637–639, Deeds, Section 28.)). In interpreting a deed, "a court must analyze the language used in the deed, 'the question being not what the parties meant to say, but the meaning of what they did say, as courts [cannot] put words into an instrument which the parties themselves failed to do.'" *Am. Energy Corp. v. Datkuliak*, 882 N.E.2d 463, 474 (Ohio Ct. App. 2007) (quoting *Larwill v. Farrelly*, 8 Ohio App. 356, 360 (1918)).

Pandora, having received the conveyer bridges through the deed from DBI, was required to use words of conveyance in order to vest ownership of the conveyer bridges back with DBI. *See, e.g.,* Ohio Rev. Code. § 5302.03 ("In a conveyance of real estate or any interest therein, the word "grant" is a sufficient word of conveyance without the use of more words. No covenant shall be implied from the use of the word "grant."); *Lighthorse*, 521 N.E.2d at 1148 ("While it is unnecessary to specifically employ the word 'grant,' some word of like import is necessary in order to effect a conveyance."). It did not do so. Whatever obligations DBI may have assumed by executing the Encroachment Agreement, it did not reacquire ownership of the conveyer bridges. *Gasely v. Separtists' Soc. of Zoar*, 13 Ohio St 144, 154 (1862) (If an attempted transfer is inoperative or void, "the property necessarily reverts to its former owners . . . .").

As a result, the parties' arguments about whether Ottawa's deed sufficiently excluded the conveyer bridges become moot. At the time of its conveyance of the Ottawa Property, DBI no

longer owned the conveyer bridges and therefore it could not have convey them to Ottawa. Pandora bought all fixtures associated with the Pandora Property and the Encroachment Agreement is not sufficient to transfer the conveyor bridges back to DBI.

Further, even if the Encroachment Agreement could be held to impose the specific obligations described within that agreement upon DBI, there is no basis to extend those obligations to Ottawa. As Ottawa argues, "a bona fide purchaser for value is bound by an encumbrance upon land only if he has constructive or actual knowledge of the encumbrance." *Emrick v. Multicon Builders, Inc.*, 566 N.E.2d 1189, 1193 (Ohio 1991) (quoting *Tiller v. Hinton*, 482 N.E.2d 946, 949 (Ohio 1985)). The Supreme Court of Ohio's discussion of the enforceability of unrecorded land use restrictions in *Emrick* applies without difficulty to the duties and obligations the Encroachment Agreement purportedly would impose on Ottawa as a successor in title to DBI. (Doc. No. 251-7 at 1). Ottawa cannot be charged with constructive notice because the Encroachment Agreement was never recorded in the chain of title for the Ottawa Property, and Pandora offers no evidence Ottawa actually knew about the Encroachment Agreement. *Emrick*, 566 N.E.2d at 1193.

As Pandora concedes, "Ottawa apparently did not itself have direct actual knowledge of the Encroachment Agreement . . . ." (Doc. No. 290 at 27). The fact that Borer was involved in both transactions and drafted the Encroachment Agreement is not relevant. Borer was not Ottawa's agent for any and all purposes; to the extent Borer was Ottawa's agent, he was Ottawa's agent only for the purpose of issuing the title commitment. There is no basis to impute his general knowledge of the Encroachment Agreement to Ottawa, because Borer did not locate the Encroachment Agreement while performing the title work <u>for Ottawa</u>, and he "did not recall [the Encroachment Agreement] at the time [he] issued the commitment". (Doc. No. 254-125).

Ohio law is clear that a principal is not deemed to know everything an agent has ever known. Instead, "the notice or knowledge, which shall be imputed to the principal . . . is that only which

11

relates to the . . . transaction in reference to which that agent is authorized to act by and for the principal." *First Nat. Bank of New Bremen v. Burns*, 103 N.E. 93, 94 (Ohio 1913). The Eighth District Court of Appeals decision in *Acacia on the Green Condominium Association, Inc. v. Jefferson*, 47 N.E.3d 207 (Ohio Ct. App. 2016), upon which Pandora relies, does not identify any exception to this general rule. In that case, the title examiner discovered a prior mortgage while performing the title work on behalf of another mortgage company and actually informed the mortgage company's title agency about the prior mortgage. *Id.* at 209.

Moreover, Pandora fails to demonstrate how Ottawa's desire to hold Borer and First American responsible for any liability Ottawa might have incurred in this litigation expands the extent of the agency relationship between Ottawa and Borer. In any event, as I discuss below, Ottawa's claims against First American fall short.

Ottawa's awareness of the existence of the bridges does not equate to actual or constructive knowledge of the requirements contained in the Encroachment Agreement, and those requirements are not enforceable against Ottawa. *Emrick*, 566 N.E.2d at 1194.

### 3. Resolution of Claims between Pandora and Ottawa

#### a. Pandora

Pandora asserts seven claims against Pandora: breach of the Encroachment Agreement, trespass, nuisance, a claim for declaratory judgment concerning ownership of the conveyer bridges, a quiet title action, an action for ejectment, and a claim for equitable relief concerning Pandora's alleged duty to remove the conveyer bridges. (Doc. No. 205 at 4-14). Pandora and Ottawa both seek summary judgment on these claims. (Doc. No. 251 and 257). Pandora's ownership of the conveyer bridges undermines the purported basis for these claims, and Ottawa is entitled to judgment in its favor on those claims.

A contract is binding only upon the parties to a contract. *Am. Rock Mechanics, Inc. v. Thermex Energy Corp.*, 608 N.E.2d 830, 833 (Ohio Ct. App. 1992). Ottawa is not a party to the Encroachment Agreement, and it is not bound by the provisions of that agreement.

"A common-law tort in trespass upon real property occurs when a person, without authority or privilege, physically invades or unlawfully enters the private premises of another whereby damages directly ensue." *Apel v. Katz*, 697 N.E.2d 600, 607 (Ohio 1998) (citations omitted). "One may commit a trespass by invading the airspace of the property of another." *Misseldine v. Corp. Investigative Servs., Inc.*, 2003-Ohio-2740, 2003 WL 21234928, at *5 (Ohio Ct. App. May 29, 2003) (citation omitted). A plaintiff who asserts a claim for a private nuisance must show there has been "'a nontrespassory invasion of another's interest in the private use and enjoyment of land' . . . [which is] either (a) intentional and unreasonable or (b) unintentional but caused by negligent, reckless, or abnormally dangerous conduct." *Kramer v. Angel's Path, L.L.C.*, 882 N.E.2d 46, 52 (Ohio Ct. App. 2007) (quoting *Brown v. Scioto Cnty. Bd. of Commrs.*, 622 N.E.2d 1153, 1158 (Ohio Ct. App. 1993)). Pandora fails to establish Ottawa has unlawfully invaded Pandora's property.

Finally, Pandora cannot maintain a quiet title or ejectment action, and Pandora is not entitled a declaratory judgment or to an order in equity requiring Ottawa to pay for the removal of the conveyer bridges, because Pandora owns the conveyer bridges.

Ottawa is entitled to summary judgment on each of Pandora's claims against it.

### b. Ottawa

Ottawa asserted five claims against Pandora: negligence, trespass, nuisance, mutual mistake, and a claim for a declaratory judgment concerning ownership of the conveyer bridges. (Doc. No. 26 at 16-24). Pandora seeks summary judgment on each claim. (Doc. No. 251). Ottawa did not move for summary judgment on its claims against Pandora. (Doc. No. 257-1 at 5).

13

Pandora claims it is entitled to summary judgment on Ottawa's negligence, nuisance, and trespass claims. A plaintiff who asserts a claim for negligence must show "the existence of a duty, a breach of the duty, and an injury resulting proximately therefrom." *Menifee v. Ohio Welding Prod., Inc.*, 472 N.E.2d 707, 710 (Ohio 1984). Ottawa argues "[a]ll three of the tort claims call upon the Court to consider whether Pandora's maintenance of the bridges it owns, which are located on property it [possesses] and controls, and which are defined as encumbrances on the property of Ottawa[,] have caused Ottawa damage." (Doc. No. 262 at 18, n.17). I conclude Pandora has not demonstrated the absence of a genuine issue of material fact as to each of the elements of these claims and is not entitled to summary judgment on them.

Nor is Pandora entitled to summary judgment on Ottawa's claim for declaratory judgment. While Ottawa has not moved for summary judgment on this claim, Rule 56(f) permits a court to enter summary judgment in favor of a party who did not move for it "[a]fter giving notice and a reasonable time to respond." *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1000 (6th Cir. 2017), cert. denied, 138 S. Ct. 1696, 200 L. Ed. 2d 952 (2018). While granting summary judgment on a claim in the absence of a motion is "discourage[d]," a court "may do so in certain limited circumstances, so long as the losing party was on notice that [it] had to come forward with all of [its] evidence." *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 829 (6th Cir. 2013) (internal quotation marks and citations omitted) (alterations in original). As I discussed above, I conclude Pandora owns the conveyer bridges, and Ottawa is entitled to a declaratory judgment to that effect.

Pandora, however, is entitled to summary judgment on Ottawa's claim for mutual mistake, regarding the Encroachment Agreement. A claim for mutual mistake seeks reformation of a written instrument. *Patton v. Ditmyer*, 2006-Ohio 7107, 2006 WL 3896780 at *5 (Ohio Ct. App. Dec, 29, 2006). "Where a statute requires certain formalities for the execution of an instrument, reformation cannot be granted to supply these formalities." *Delfino v. Paul Davies Chevrolet, Inc.*, 209 N.E.2d 194,

14

197 (Ohio 1965). The Encroachment Agreement lacks statutorily-required words of conveyance and the doctrine of reformation may not be used to add such words.

### C. FIRST AMERICAN

First American is entitled to summary judgment on each of Ottawa's claims against it. (Doc. No. 212). The policy First American provided does not protect against every source of damage to Ottawa's property. (*See, e.g.,* Doc. No. 250-1 at 26-27). As Ottawa acknowledges, First American's policy "insures Ottawa against 'title being vest other than as stated" in the title commitment. (Doc. No. 268 at 12). First American provided Ottawa with a title insurance policy, and Ottawa offers no evidence there is anything wrong with its title. Ottawa fails to provide evidence that the possibility that Ottawa's property may be worth less than Ottawa paid for it, because of the presence of the conveyer bridges, is a matter covered by the title insurance policy. As a result, Ottawa fails to establish a genuine dispute of material fact concerning its breach of contract claim or its declaratory judgment claim against First American, and First American is entitled to summary judgment as a matter of law.

First American also is entitled to summary judgment on Ottawa's negligence and fiduciary-duty claims, because Ottawa fails to establish First American breached any duty it may have had to Ottawa, or that Ottawa suffered any damage as a result of any hypothetical breach. Finally, Ottawa fails to identify facts to support its fraud and bad faith claims against First American, and First American is entitled to summary judgment on those claims as well.

### D. GENESEE & WYOMING

Genesee & Wyoming seeks summary judgment on Ottawa's claims for negligence, trespass, private nuisance, and declaratory judgment. (Doc. No. 252).

Ottawa's tort claims fall short because Genesee & Wyoming owes no duty to Ottawa. Ottawa claims Genesee & Wyoming is liable because it could have required that Philips remove the

15

bridges but failed to do so. (Doc. No. 263 at 24). Even if Genesee & Wyoming previously could have required Philips to remove the bridges, it no longer can do so because, as I discuss below, Philips no longer has any obligations under the Easement Agreement or the License Agreement. Further, and as Genesee & Wyoming argues, "[i]f having a contractual right vis-à-vis another party is all that is required to create a duty to third parties, the exception would swallow the rule and create unexpected and unwelcome exposure that would be difficult, and in some cases, impossible, to predict at the time of contracting." (Doc. No. 288 at 14).

Finally, Genesee & Wyoming is entitled to summary judgment on Ottawa's declaratory judgment claim, (Doc. No. 48 at 23-24), because there is no evidence that Genesee & Wyoming has any responsibility for maintaining or removing the conveyer bridges.

### E. PHILIPS

Pandora asserts claims against Philips for equitable relief, negligence, breach of contract, a third-party beneficiary breach of contract claim based upon the contract between Philips and the Detroit Railroad, and for declaratory relief. (Doc. No. 205). Pandora, pursuant to a settlement and assignment agreement with Genesee & Wyoming, (Doc. No. 205-7), also asserts claims on behalf of the railroad against Philips. (Doc. No. 205 at 15). Ottawa asserts claims against Philips for negligence, trespass, nuisance, and for declaratory judgment. (Doc. No. 48). Philips seeks summary judgment on all of these claims. (Doc. No. 256).

Philips sold all of its rights to and interest in the property located at 700 N. Pratt in Ottawa, Ohio, including all improvements, appurtenances, fixtures, and "personal property of every kind", to DBI. (Doc. No. 251-2 at 1-23). While Pandora alleges Philips has a duty to maintain and remove the conveyer bridges under the Easement Agreement and the License Agreement, Pandora is unable to point to any facts or law which would justify separating contractual obligations from the property rights covered by those agreements.

Unless otherwise stated, the sale of a dominant tenement includes the usage rights formalized by an easement. *See, e.g., Pence v. Darst*, 574 N.E.2d 548, 551 (Ohio Ct. App. 1989) ("Once an easement becomes part of the chain of title of the dominant property, such easement passes with the transfer of the property."). "[A]n easement holder may not impose additional burdens upon the servient estate by engaging in additional usage of the easement." *Goralske v. Parsell*, 59 N.E.3d 730, 738–39 (Ohio Ct. App. 2016) (citation omitted).

Pandora fails to establish a basis for the necessary conclusion that some restrictions contained in the Easement Agreement – such as the limitation that the easement be used only for the operation of a conveyer bridge – pass from one owner of the dominant tenement to the next, but other restrictions – such as the conditions of the removal of the conveyer bridges or the indemnification provisions – remain with the initial owner of the dominant tenement, who no longer holds any property interest in either the dominant or servient tenements. Further, what Pandora advocates would enlarge the easement, because it would permit subsequent owners to use the easement without the express conditions imposed by the easement's grantor.

Pandora and Ottawa also fail to establish Philips has any remaining obligations under the License Agreement. As an initial matter, the License Agreement did not require Philips to "tear down the conveyer." (Doc. No. 269 at 8). Instead, that agreement required the "Licensee . . . to remove all of Licensee's material from the premises of the Licensor." (Doc. No. 251-2 at 43). Once Philips completed its transaction with DBI, Philips no longer owned any material on or around the railroad's property – DBI did.

Moreover, the License Agreement granted Philips a revocable license to use the air rights over the railroad tracks, and that agreement terminated when Philips sold the warehouses to DBI. *Countywide Landfill, Inc. v. Charton*, 1993 WL 437748, at *2 (Ohio Ct. App. Oct. 25, 1993) ("A license which does not run with the land is terminated when the purpose has been accomplished or by

17

conveyance of the property.") (citing *Fowler v. Delaplain*, 87 N.E. 260 (Ohio 1909), and 36 O.Jur.3d, Easement and Licenses, Sections 114, 115, p. 523-24).

The License Agreement also contains no indication that the parties intended for the indemnification provision to survive the termination of the contract, and Pandora and Ottawa fail to show it would be appropriate for me to conclude now that the parties in fact had such an intention. *See, e.g., Chicago W. Pullman Corp. v. Quinn*, No. 98CA007048, 1999 WL 74628, at *3 (Ohio Ct. App. Feb. 9, 1999) (noting a court "in effect create[s] a new contract by finding an intent not expressed in the clear language employed by the parties") (quoting *Alexander*, 374 N.E.2d at 150).

Finally, Ottawa's tort claims against Philips fail for the same reasons as its tort claims against First American. Ottawa fails to identify evidence to support the conclusion that Philips owed a duty to Ottawa, or that it breached any duty it hypothetically owed.

Philips is entitled to summary judgment on each of the claims asserted against it.

## V. CONCLUSION

For the reasons stated above:

(a) Pandora's motion for summary judgment, (Doc. No. 251), is granted in part and denied in part. The motion is granted as to Ottawa's claim for mutual mistake, and denied on all other grounds;

(b) Ottawa's motion for summary judgment as to Pandora's claims against Ottawa, (Doc. No. 257), is granted, and its motion for summary judgment as to Ottawa's claims against First American, (Doc. No. 258), is denied;

(c) First American's motion for summary judgment, (Doc. No. 250), is granted;

(d) Genesee & Wyoming's motion for summary judgment, (Doc. No. 252), is granted;

(e) Philips' motion for summary judgment, (Doc. No. 256), is granted; and

(f) Having concluded the record evidence and applicable law conclusively establish that Pandora owns the conveyer bridges, I enter summary judgment on Ottawa's claim for declaratory judgment as to the ownership of the conveyer bridges. Ottawa's negligence, nuisance, and trespass claims remain outstanding.

So Ordered.

s/ Jeffrey J. Helmick  
United States District Judge