UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Pandora Distribution, LLC,                                  Case No. 3:12-cv-2858

          Plaintiff,

   v.                                                          MEMORANDUM OPINION
                                                                                                             AND ORDER

Ottawa OH, LLC, et al.,

          Defendants.

## I. INTRODUCTION

Pandora Distribution, LLC ("Pandora") and Ottawa OH, LLC ("Ottawa") have filed motions for reconsideration of my opinion ruling on summary judgment motions filed by Pandora, Ottawa, Philips Electronics North America Corporation ("Philips"), Genessee & Wyoming, Inc., and First American Title Insurance Company on a variety of claims, counter-claims, and cross-claims. (Doc. No. 320 and Doc. No. 323). Ottawa subsequently filed a "corrected" motion for reconsideration in order to provide documents of greater clarity, which I appreciate. (Doc. No. 331). The briefing on the motions for reconsideration is complete. For the reasons stated below, I deny both motions.

## II. BACKGROUND

I laid out the factual and procedural history of this litigation in my earlier summary judgment opinion. *See Pandora Distribution, LLC v. Ottawa OH, LLC, et al.*, No. 3:12-cv-2858, 2019 WL 2924995 (N.D. Ohio July 8, 2019) ("*Pandora I*"). Briefly, this case involves contract and tort claims regarding two warehouses in Ottawa, Ohio, which are separated on the surface by railroad tracks operated by Genesee & Wyoming but connected by two conveyer bridges. The eastern warehouse is owned by Pandora (the "Pandora Property") and the western warehouse is owned by Ottawa (the "Ottawa Property"). Pandora and Ottawa each purchased their respective properties from DBI Partners, LLC, in separate transactions. Ottawa purchased the Ottawa Property approximately 11 months after Pandora had purchased the Pandora Property. Pandora subsequently sued Ottawa and DBI, seeking to require one or both to pay for the removal of the conveyer bridges.

I previously concluded the conveyer bridges are fixtures which, pursuant to Ohio Revised Code § 5302.04, DBI conveyed to Pandora during the purchase of the Pandora Property. *Pandora I*, 2019 WL 2924995, at *3-5. On that basis, I concluded (a) Ottawa was entitled to summary judgment on each of Pandora's claims against it and on Ottawa's declaratory judgment claim against Pandora; (b) Pandora was entitled to summary judgment on Ottawa's claim for mutual mistake but not on Ottawa's tort claims against Pandora; (c) First American was entitled to summary judgment on each of Ottawa's claims against it; (d) Genesee & Wyoming was entitled to summary judgment on Ottawa's claims against it; and (e) Philips was entitled to summary judgment on all claims against it. *Id.* at *6-10.

Pandora and Ottawa both requested leave to file motions for reconsideration. (Doc. No. 319). As First American points out, (Doc. No. 325 at 1), Ottawa requested "leave to raise arguments for clarification of my ruling concerning its claims against First American Title Insurance Company, specifically First American's alleged duty to defend Ottawa in this litigation." (Doc. No. 319 at 2).

Instead, Ottawa filed a motion for reconsideration of all of my rulings concerning its claims against First American as well as my rulings against Pandora and those in <u>Ottawa's</u> favor. While Ottawa exceeded the scope of the leave I granted, I conclude that does not warrant dismissing Ottawa's motion for reconsideration as being untimely and without leave of court. Had Ottawa accurately described its intentions, I likely would have granted Ottawa leave to file its motion.[1] Now that the motion has been filed and fully briefed, the principles promoting resolution of claims on their merits weighs in favor of resolving the motion as filed.

Pandora challenges (1) my rejection of Count Ten of its Complaint, which seeks equitable relief against Ottawa, Philips, or both; and (2) my conclusion that ownership of the conveyer bridges transferred to Pandora pursuant to the deed Pandora received when it purchased the Pandora Property from DBI. (Doc. No. 320).

For its part, Ottawa challenges my conclusion that First American did not breach its promises to defend Ottawa or to indemnify Ottawa for dishonesty, fraud, or a failure to deliver requested documents. (Doc. No. 331). Ottawa also challenges my rulings that the conveyor bridges were fixtures that were conveyed by deed from Philips to DBI and then from DBI to Pandora, and my ruling that Philips has no duty to indemnify Pandora for the cost of removing the conveyor bridges. (Doc. No. 322).

### III.  STANDARD

While "[d]istrict courts have inherent power to reconsider interlocutory orders," *Mallory v. Eyrich*, 922 F.2d 1273, 1282 (6th Cir. 1991), the bar for granting a motion for reconsideration is set high. *See, e.g., Reich v. Hall Holding Co.*, 990 F. Supp. 955, 965 (N.D. Ohio 1998) (*citing Petition of U.S. Steel Corp.*, 479 F.2d 489, 494 (6th Cir. 1973)) ("The major grounds justifying reconsideration of

---

[1] Notwithstanding the fact that Ottawa's response to Pandora's motion for reconsideration amounts to its <u>third</u> request for reconsideration of my opinion denying its motions for leave to file new summary judgment motions. (Doc. No. 285; Doc. No. 311; Doc. No. 316).

3

interlocutory orders are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.").

Motions for reconsideration under Rule 59(e) are not intended to give a party "an opportunity to relitigate matters already decided . . . [or to be] a substitute for appeal." *Turner v. City of Toledo*, 671 F. Supp. 2d 967, 969 (N.D. Ohio 2009) (quoting *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 395 (6th Cir.2007)). "Whatever may be the purpose of Rule 59(e) it should not be supposed that it is intended to give an unhappy litigant one additional chance to sway the judge." *Dana Corp. v. United States*, 764 F. Supp. 482, 489 (N.D. Ohio 1991) (quoting *Durkin v. Taylor*, 444 F. Supp. 879 (E.D. Va. 1977)).

### IV.  ANALYSIS

#### A. THE BRIDGES

In ruling on the various summary judgment motions filed by the parties, I concluded the conveyor bridges were fixtures which passed by deed from Philips, which constructed them, to DBI when DBI purchased the real property that underlies this litigation. *Pandora I*, 2019 WL 2924995, at *3-5. I also concluded the conveyor bridges passed by deed from DBI to Pandora through the deed to the Pandora Property and that the Encroachment Agreement between DBI and Pandora did not nullify the transfer or transfer the conveyor bridges back to DBI. *Id.* at *5-6. Pandora and Ottawa argue I made a clear error of law in reaching these conclusions.

##### 1. Fixtures

Ottawa claims the conveyor bridges were Philips' personal property, not fixtures, and did not transfer pursuant to the deeds and that the easement agreement and license agreement between Philips and the railroad could not have transferred to DBI, or subsequently to Pandora or Ottawa, because they involve personal rights, not property rights. (Doc. No. 320 at 10-24).

4

"Personal property may be converted into a fixture if the following criteria are met: '(1) [a]ctual annexation to the realty or something appurtenant thereto; (2) appropriation to the use or purpose of the realty with which it is connected; and (3) the intention of the party making the annexation to make the article a permanent accession to the freehold.'" *Pandora I*, 2019 WL 2924995, at *3 (quoting *Zangerle v. Standard Oil Co. of Ohio*, 60 N.E.2d 52, 56 (Ohio 1945)). I applied these criteria to the facts of this case and concluded the conveyor bridges are fixtures.

Ottawa argues I got every one of these factors wrong. (Doc. No. 322 at 19).

First, Ottawa contends the conveyor bridges are not fixtures because they are not located on land, seeing that they cross the railroad's air rights. (*Id.* at 19-20). According to Ottawa, "[t]he bridges are on the Railroad's land because the contracts say so and because the Railroad owns air rights above its land." (Doc. No. 320 at 20).

Ottawa's argument quickly falls apart, even in the light of the Ohio Court of Common Pleas case upon which it relies. As Ottawa notes, in *Cleveland Electric Illuminating Co. v. Continental Express*, 733 N.E.2d 328 (Ohio Com. Pl. 1999), the court held "power poles were fixtures on an easement, not on the properties served." (Doc. No. 322 at 20). In that case, "the utility pole and the attached equipment" are annexed to the real property because the utility pole is secured to the ground. *Cleveland Elec. Illum. Co.*, 733 N.E.2d at 329. The plaintiff had been granted an easement in the land from the city of Cleveland, and the plaintiff, not the city of Cleveland, had standing to bring a cause of action for damages caused to the fixtures. *Id.* at 328-29.

If the grantee of an easement maintains ownership rights in property that has been erected within the easement, then the conveyer bridges plainly do not belong to the railroad. Bridges are appurtenant to the land to which they connect, not the air through which they pass. *See, e.g., Mid-Ohio Mech., Inc. v. Carden Metal Fabricators, Inc.*, 862 N.E.2d 543, 548 (Ohio Ct. App. 2006) (An appurtenance is "'[a]n article adapted to the use of the property to which it is connected, and which

5

was intended to be a permanent accession to the freehold. A thing is deemed to be incidental or appurtenant to land when it is by right used with the land for its benefit, as in the case of a way, or watercourse, or of a passage for light, air, or heat from or across the land of another.'" (quoting Black's Law Dictionary 94 (5th Ed.1979))); *Sandusky Bay Bridge Co. v. Fall*, 181 N.E. 112, 113 (Ohio Ct. App. 1931) (holding that the status of a bridge and its approaches as fixtures to real property was not affected by the partial construction of the bridge in air space over navigable waters); *Citizens' Sav. & Tr. Co. v. Cincinnati & D. Traction Co.*, 140 N.E. 380, 391 (Ohio 1922) ("The underlying principle of the law of fixtures is that 'whatever is annexed to the soil becomes a part thereof.'").

Second, Ottawa argues the conveyor bridges are not fixtures because they "were designed and built to avoid interfering with the Railroad's operations . . . [and therefore] were adaptations to the Railroad's land." (Doc. No. 322 at 20). Ottawa also claims the conveyer bridges are business fixtures[2] under *Litton Systems, Inc. v. Tracy*, 728 N.E.2d 389 (Ohio 2000), not fixtures to real property. (*Id.*).

I concluded above that Ottawa's first argument lacks merit. In its second argument, Ottawa fails to acknowledge the evident differences between the conveyor bridges in this case and the conveyors at issue in *Litton Systems*. The conveyors in that case were installed entirely inside two distribution centers and simply attached to the pre-existing beams and supports of the distribution centers. *Litton Sys., Inc.*, 728 N.E.2d at 389. By contrast, the conveyor bridges between the two warehouses required structural alterations to the outside of the buildings, and a subsequent business

---

[2] A "business fixture" is "an item of tangible personal property that has become permanently attached or affixed to the land or to a building, structure, or improvement, and that primarily benefits the business conducted by the occupant on the premises and not the realty." Ohio Rev. Code Ann. § 5701.03(B). In essence, a business fixture is property secured to realty which fails to satisfy the second *Teaff* factor (which requires the item benefit the realty and not simply the business conducted on the realty).

6

which owned one or both of the warehouses could not simply "remove the [conveyor bridges] and use in another way the space the [conveyor bridges] occupied." *Id.* at 392.

Third, Ottawa argues the conveyor bridges are not permanent because the easement agreement and the license agreement gave the railroad the option to require Philips to remove the conveyor bridges. (Doc. No. 322 at 21-22). Ottawa then proceeds to support its argument with a misstatement of my decision in *Pandora I*, an erroneous claim that *Holland Furnace Co. v. Trumbull Savings & Loan Co.* has been overruled, and a return to its incorrect argument that the conveyor bridges are business fixtures and could never be considered real property. (*Id.*).

"[W]hile an agreement between the parties is relevant as to the issue of intent, . . . . an intent to create a fixture also has an objective component in that for a chattel to be found to be a fixture, it must be affixed to the realty in such a manner that it will indicate to all persons dealing with the realty that it was the intention and purpose of the owner of the chattel to make it a permanent attribute of the realty." *In re Jarvis*, 310 B.R. 330, 336 (Bankr. N.D. Ohio 2004) (citing *Holland Furnace Co. v. Trumbull Sav. & Loan Co.*, 19 N.E.2d 273 (Ohio 1939)).

A party's objective or outward-facing intention to permanently annex a chattel to real property:

> may be inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the structure and mode of annexation, the purpose and use for which the annexation is made, the utility in use or the indispensability of the combination when the chattel is once attached to the realty in the use of the whole, and the relationship of the owner of the chattel to the owner of the realty and to others who may become interested in or owners of the property.

*Pandora I*, 2019 WL 2924995, at *4 (quoting *Holland Furnace Co.*, 19 N.E.2d at 275-76). The "intention of the party making the annexation, . . . being inferred from the <u>nature</u> of the article affixed, the <u>relation</u> and <u>situation</u> of <u>the party</u> making the annexation, the structure and mode of annexation, and the purpose or use for which the annexation has been made" objectively demonstrate that Philips, by connecting two buildings it owned through two openings it created in

7

those two buildings, intended the conveyor bridges to be "permanent accession[s]." *Teaff v. Hewitt*, 1 Ohio St. 511, 530 (1853) (emphasis in original).

Further, Ottawa misstates the terms of the easement agreement and the license agreement. Those agreements did not make removal "mandatory." (*See* Doc. No. 322 at 22). Rather, they set out circumstances in which the railroad could terminate the license or in which the easement may expire. (Doc. No. 251-2 at 43-44, 47-48). The railroad's attempts to safeguard its ownership interest in its air rights does not alter the objective circumstances which indicate Philips intended the conveyer bridges to be fixtures. *Cf. Masheter v. Boehm*, 295 N.E.2d 917, 920 (Ohio Ct. App. 1973), *rev'd on other grounds*, 307 N.E.2d 533 (Ohio 1974) (Property "is not less a fixture because, having a limited life, it may have to be eventually replaced, or substantially overhauled.").

**2. Conveyance**

Both Pandora and Ottawa claim that, even if the conveyor bridges are fixtures, the deed to the Pandora Property is ambiguous because it did not mention the conveyor bridges, and therefore the deed must be construed against DBI, excluding the conveyor bridges. (Doc. No. 320 at 12; Doc. No. 322 at 25). Again, § 5302.04 plainly states "all rights, easements, privileges, and appurtenances belonging to the granted estate shall be included in the conveyance, unless the contrary is stated in the deed, and it is unnecessary to enumerate or mention them either generally or specifically." Ohio Rev. Code § 5302.04; *see also Pandora I*, 2019 WL 2924995, at *4-5. Neither Pandora nor Ottawa cites any case law limiting the effect of this statutory provision, because there is none. This argument, while essential to Pandora's and Ottawa's desired outcomes for this case, lacks any merit. The fact that the deed was silent as to the conveyor bridges means the deed transferred the conveyor bridges, which are appurtenances to the Pandora Property. Ohio Rev. Code § 5302.04 (". . . <u>it is unnecessary to enumerate or mention them either generally or specifically</u>" (emphasis added)).

8

Nevertheless, Ottawa persists, arguing that the Encroachment Agreement "was part of the deed." (Doc. No. 322 at 26). If this were true, of course, one might expect to find evidence of the Encroachment Agreement within the four corners of the deed from DBI to Pandora. No such reference exists, (Doc. No. 252-10), and therefore Ottawa's argument lacks any merit.

**3. Severance**

Next, Pandora argues I failed to take into account that the conveyor bridges were "actually a part of both parcels," and that the deed to the Pandora Property could not have transferred the conveyor bridges because it did not also transfer an interest in the portion of the Ottawa Property to which the conveyor bridges attach. (Doc. No. 320 at 11).

Ohio law does not require that a chattel be irremovable in order to become a fixture. *See Teaff*, 1 Ohio St. at 528. Nor does it prohibit a fixture from becoming a chattel again, and later regaining the status of a fixture once again. *Andover Twp. Bd. of Trustees v. O'Brien*, 823 N.E.2d 524, 528 (Ohio Ct. App. 2004) ("The fact that the property owner could cut off [a structure] does not make the structure any less a fixture while it still stands."). While it requires great skill and a careful approach, a house may be removed from its foundation and transported to a new location, where it may once again be affixed to the real property.

Further, Ohio law recognizes that, in some circumstances, a fixture may be constructively severed from real property even though it has not actually been removed. *See, e.g., Masheter*, 295 N.E.2d at 925-26. Therefore, it is not necessary for the deed to the Pandora Property to describe some portion of the Ottawa Property in order for Ohio law to mandate the conclusion that Pandora purchased the conveyor bridges. The conveyor bridges remained fixtures on the Pandora Property after the transfer of that property constructively severed the conveyor bridges from DBI's ownership interest in the other warehouse.

9

Moreover, the conveyor bridges are no less fixtures simply because they encroach onto a neighboring property. *See, e.g., Jacks v. Brewington,* 896 N.E.2d 226, 227 (Ohio Ct. App. 2008) (The encroachment of the defendant's house onto a neighboring property was evidence of the open and exclusive possession of a two-foot wide area of the plaintiffs' property.); *McGuire v. Kashen*, No. L-94-294, 1995 WL 547781 (Ohio Ct. App. Sept. 15, 1995) (driveway which encroached onto neighboring property was an open and adverse use of neighboring property).

### 4. Deed Reformation

Both Pandora and Ottawa argue Pandora's deed may be reformed to reflect the alleged intent of the Encroachment Agreement. I previously concluded "[t]he Encroachment Agreement lacks statutorily-required words of conveyance and the doctrine of reformation may not be used to add such words." *Pandora I*, 2019 WL 2924995, at *8. Pandora and Ottawa fail to acknowledge this conclusion or offer any reason why Ohio law does not mandate that outcome. *See Delfino v. Paul Davies Chevrolet, Inc.*, 209 N.E.2d 194, 197 (Ohio 1965) ("Where a statute requires certain formalities for the execution of an instrument, reformation cannot be granted to supply these formalities.").

Nor can the parties belatedly assert a deed reformation claim concerning the deed to the Pandora Property. Neither Pandora nor Ottawa pled a claim seeking reformation of the limited warranty deed between Pandora and DBI. There is a ten-year statute of limitations for deed reformation claims, Ohio Revised Code § 2305.14, and the limitations period begins to run when the parties execute the deed and not when they discover an alleged mistake. *See, e.g., United States v. Skorepa*, No. 5:05 CV 750, 2005 WL 3634605, at *7 (N.D. Ohio Dec. 20, 2005).

Further, the exception to the statute of limitations found in Ohio Revised Code § 2305.22 exists to permit a purchaser "in possession of real property to have that property legally conveyed to him." *Freeport Lodge #415 Free & Accepted Masons of Ohio v. MC Mineral Co.*, 120 N.E.3d 422, 426 (Ohio Ct. App. 2018). That exception does not apply in this case because Pandora does not claim

10

the deed should have included the bridges and mistakenly did not; rather it seeks to avoid the consequences of the deed it accepted.

### 5. Merger by Deed

Pandora also argues I erred in citing to *37 Robinwood Associates v. Health Industries, Inc.*, 547 N.E.2d 1019 (Ohio Ct. App. 1988), which discusses the doctrine of merger by deed. (Doc. No. 320 at 12-14).

While concluding the plain language of the deed between DBI and Pandora transferred the conveyor bridges to Pandora pursuant to Ohio Revised Code § 5302.04, I wrote that if Pandora "did not intend to buy the conveyer bridges, it had an opportunity to insist that DBI amend the language of the deed to conform to what Pandora describes as the parties' agreement. Once it accepted the deed, however, Pandora became bound by the terms of the deed." *Pandora I*, 2019 WL 2924995, at *5.

While the merger-by-deed doctrine may not be directly relevant to the relationship between Pandora and Ottawa, (Doc. No. 320 at 13), it is relevant to the relationship between Pandora and DBI. "The doctrine of 'merger by deed' holds that whenever a deed is delivered and accepted 'without qualification' pursuant to a sales contract for real property, the contract becomes merged into the deed and no cause of action upon said prior agreement exists." *37 Robinwood Assocs.*, 547 N.E.2d at 1021. "[I]f there is a specific survival clause in the prior contract of sale, or in a contemporaneous document delivered at the same time as the deed, which states that its provisions are to survive the delivery of the deed, then the merger doctrine does not apply." *V.T. Larney, Ltd. v. Locust St. Inv. Co., LP*, 2019-Ohio-496, ¶ 28, 2019 WL 549646, at *5 (Ohio Ct. App., Feb. 4, 2019).

Neither the purchase agreement for the Pandora Property nor the Encroachment Agreement contained the types of survival clauses necessary to avoid the merger-by-deed doctrine. By accepting the deed from DBI, Pandora became bound by its plain language, which I already have

11

concluded mandates the transfer of the conveyor bridges to Pandora. Further, DBI's obligations under the Encroachment Agreement are a matter of contract, not real property law, because, while the language of the Encroachment Agreement was insufficient to transfer ownership of the conveyor bridges back to DBI, the contractual language was sufficient to impose those obligations on DBI. (*See* Doc. No. 25 at 5-6).

### 6. Philips' Alleged Duty of Indemnification

Finally, Ottawa also claims I erred by ruling Philips has no duty to indemnify Pandora (through Genesse & Wyoming's assignment of rights) because Philips and the railroad intended the indemnification clause of the license agreement to survive the termination of that agreement. (Doc. No. 322 at 28-29). Ottawa's argument relies on an incorrect reading of the license agreement.

I concluded Philips no longer owned any "material" on the property in question because it sold all of its "material" to DBI, and that the license agreement terminated when Philips completed its transaction with DBI. *Pandora I*, 2019 WL 2924995, at *9-10. Section 5, upon which Ottawa relies, does not reference the indemnification provision and says nothing about whether the parties intended for the indemnification provision to survive termination of the contract. The phrase in § 5, "[o]n the expiration, revocation or cancellation [of the license agreement]," triggers the licensee's contractual duty to remove all of its "material from the premises . . . and to leave the same in a neat, clean and level condition." (Doc. No. 251-2 at 43). If the licensee did not do so within 20 days, the licensor could perform the work and was entitled to be reimbursed by the licensee within 30 days after providing a "bill for same." (*Id.*).

The contract's termination was a condition precedent to the licensee's duty to remove "material." When a contract does not state a time period in which a contractual duty must be performed, Ohio law requires that duty be performed in a "[r]easonable time . . . to be determined from the surrounding conditions and circumstances which the parties contemplated at the time the

12

contract was executed." *Miller v. Bealer*, 608 N.E.2d 1133, 1135 (Ohio Ct. App. 1992). The license agreement contemplated the licensee could remove "all [its] material" within 20 days of the termination of the agreement, and if the licensee did not do so, the licensor could do the work and bill the licensee. (Doc. No. 251-2 at 43). Ottawa offers no plausible basis to conclude, in view of the plain terms of the contract, that the licensor's ability to choose to do the work and subsequently bill Philips extends indefinitely.

Further, the indemnification provision is found in § 3 of the license agreement, not § 5. (Doc. No. 251-2 at 43). If the parties wanted to provide for the survival of this provision beyond the termination of the agreement, they could have done so. *See, e.g., Litton Fin. Printing Div. v. N.L.R.B.*, 501 U.S. 190, 207 (1991) (stating the general principle that "contractual obligations will cease, in the ordinary course, upon termination of the [contract]"). Contrary to Ottawa's claim, it is easy to imagine a clear statement of the parties' intent on this matter. The contract easily could have stated that "the parties intend the rights and responsibilities stated in § 3 to survive the termination or expiration of this agreement." It did not include this or similar language, and the condition-precedent language of § 5 in no way conveys an intent to require Philips to indemnify Genesee & Wyoming indefinitely.

Pandora and Ottawa fail to show I committed a clear error in concluding Pandora owns the bridges.

### B. PANDORA'S CLAIM FOR EQUITABLE RELIEF

Pandora asserts I "misunderstood" the scope of Count Ten of its complaint, which purports to assert a claim for equitable relief against Philips and Ottawa. (Doc. No. 320 at 8). As Pandora acknowledges, (*id.* at 5), Rule 8 requires a party to offer "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As Pandora also acknowledges, what Count Ten says "is more accurately described as broadly requesting an equitable

13

remedy if a legal one is unavailable despite the fact that Pandora took considerable action to ensure it did not purchase the [conveyor bridges]." (Doc. No. 320 at 3).

There are a number of problems with Pandora's arguments, but it is sufficient to discuss two in resolving Pandora's motion for reconsideration.

First, Pandora had a legal remedy – a breach of contract claim against DBI. Pandora made such a claim and received a judgment in its favor on that claim, through my entry of a default judgment against DBI in the amount of $160,000, plus costs. (Doc. No. 62). Under Pandora's "more accurate[] descri[ption]" of Count Ten, Pandora's request for equitable relief is mooted by the fact it obtained legal relief.

Pandora no doubt will argue that it still has an equitable claim because it has not been able to collect on its judgment against DBI. Whatever the relative merit of this argument may be, Pandora did not plead a claim for equitable relief. It broadly alleged that equity should permit Pandora to recover relief in some form that "was impossible to predict at the pleading stage . . . ." (Doc. No. 320 at 3). Pleadings which are "not sufficiently definite or certain to apprise the defendant of the basis for the relief claimed" do not state a claim for relief. *Blake v. De Vilbiss Co.*, 118 F.2d 346, 347 (6th Cir. 1941); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (U.S. 2007) ("[T]he pleading must contain something more ... than ... a statement of facts that <u>merely creates a suspicion [of] a legally cognizable right of action</u>") (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–236 (3d ed.2004)) (emphasis added).

Pandora also argues I made a clear error in granting summary judgment on Count Ten because equity should bind Ottawa "by some species of consent for the conveyors to remain in place." (Doc. No. 320 at 6). Pandora goes on to discuss implied easements and an easement by estoppel. (*Id.* at 6-7). Pandora's arguments fall short.

"An implied easement or way of necessity is based upon the theory that without it the grantor or grantee, as the case may be, [cannot] make use of his land." *Trattar v. Rausch*, 95 N.E.2d 685, 689 (Ohio 1950). Pandora offers no reason to conclude this type of necessity exists in this case.

Nor can Pandora show the facts of this case create an easement by estoppel, as "such an easement cannot be claimed by one who has not been misled or caused in any way to change his position to his prejudice." *Monroe Bowling Lanes v. Woodsfield Livestock Sales*, 244 N.E.2d 762, 765 (Ohio Ct. App. 1969). Pandora, which did not demand anyone remove the conveyor bridges until after Ottawa completed its purchase of the Ottawa Property, offers no evidence it was misled by any party remaining in this litigation.

Pandora fails to show I committed a clear error in granting summary judgment on Count Ten of its complaint.

### C. OTTAWA AND FIRST AMERICAN

Ottawa claims I committed a clear error in concluding First American had no duty to defend Ottawa in this litigation, or to indemnify Ottawa for damages Ottawa allegedly suffered due to First American's participation in a constructive fraud scheme. (Doc. No. 331 at 8, 16). Ottawa's arguments are based on an incorrect statement of the terms of the title insurance policy.

Insurers have "an absolute duty to defend an action when the complaint contains an allegation in any one of its claims that could arguably be covered by the insurance policy, even in part and even if the allegations are groundless, false, or fraudulent." *Sharonville v. Am. Emp'rs Ins. Co.*, 846 N.E.2d 833, 837 (Ohio 2006) (citing *Sanderson v. Ohio Edison Co.*, 635 N.E.2d 19 (Ohio 1994)). "Where the provisions of the policy are clear and unambiguous, courts cannot enlarge the contract by implication so as to embrace an object distinct from that originally contemplated by the parties." *Rhoades v. Equitable Life Assurance Soc'y of U. S.*, 374 N.E.2d 643, 644 (Ohio 1978) (citing *Motorists Mut'l Ins. Co. v. Tomanski*, 271 N.E.2d 924 (Ohio 1971)). Ottawa has the burden of establishing

15

coverage under the title insurance policy. *Inland Rivers Serv. Corp. v. Hartford Fire Ins.*, 418 N.E.2d 1381, 1383 (Ohio 1981).

While the insurer's duty to defend does not depend upon the ultimate resolution of the litigation, a complaint does not trigger the insurer's duty to defend "when all the claims are clearly and indisputably outside of the contracted policy coverage." *Sharonville*, 846 N.E.2d at 837. Title insurance policies limit the extent of the title insurer's liability to the insured through the use of exclusions and exceptions from coverage. Exclusions from coverage "limit the applicability of the insuring clauses," while exceptions from coverage prohibit the insured from recovering under a policy when "a specific exception is established even though there would be insurance if a loss occurred and no exception existed." *Peoples Bldg. & Loan Co. v. Safeco Title Ins. Co. of Md.*, No. 10569, 1988 WL 72388, at *8 (Ohio Ct. App. July 5, 1988).

Ottawa incorrectly claims the title insurance policy does not include any exceptions related to encroachments. (Doc. No. 331 at 8 ("The Policy has no exceptions from coverage for the alleged encroachments or the Encroachment Agreement.")).

The policy plainly does. The policy states it "is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described." (Doc. No. 212-4 at 3, § 7). The contract between Ottawa and First American goes on to state, in a schedule titled "**<u>EXCEPTIONS FROM COVERAGE</u>**," it "does not insure against loss or damage (and [First American] will not pay costs, attorneys' fees or expenses) which arise by reason of . . . a License Agreement between Grand Trunk Western Railroad Company and Philips ECG, Inc., dated December 18, 1986, relating to the elevated conveyor bridge . . . [and] an encroachment by an existing overhead bridge conveyor onto the premises in question . . . ." (*Id.* at 5-6 (bolding, underlining, and use of capital letters in original)).

16

Though these exceptions may be broad, they are not ambiguous. Ohio law presumes the parties' intent is "reflected in the language used in the policy," and a policy is not ambiguous simply because the policy does not define a term. *Chicago Title Ins. Co. v. Huntington Nat'l Bank*, 719 N.E.2d 955, 959 (Ohio 1999) (citations omitted). The "plain and ordinary meaning of the language used in the policy" is that the policy does not provide coverage for claims which arise from the conveyor bridges. *Id.* Therefore, First American had no duty to defend Ottawa against Pandora's claims for damages it allegedly suffered as a result of the conveyor bridges.

Ottawa seeks to circumvent the plain language of the contract it agreed to by concocting an elaborate story which accuses at least four individuals of engaging in a scheme of constructive fraud beginning over ten months prior to Ottawa's purchase. But, because Ottawa's end goal actually is reinstating its bad-faith claim against First American (for First American's alleged failure to notify Ottawa it purportedly was purchasing the conveyer bridges), Ottawa's story must explain why Pandora does not own the conveyor bridges. As I concluded above, Ottawa and Pandora fail to show I committed a clear error of law in concluding Pandora owns the conveyor bridges.

Ottawa fails to establish I committed a clear error of law in concluding First American had no duty to defend Ottawa in this litigation or that First American is entitled to summary judgment on Ottawa's other claims against it.

## V.  CONCLUSION

For the reasons stated above, I conclude the motions for reconsideration filed by Pandora, (Doc. No. 320), and Ottawa, (Doc. No. 331), lack merit. Therefore, those motions are denied.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge